**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSE LUIS BENITEZ AND JUAN REYES,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No.  08 CV 1998** |
| **v.** | ) | |
| **AMERICAN STANDARD CIRCUITS, INC.** | ) | **JUDGE DAVID H. COAR** |
| **and VIJAY PATEL,** | | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Jose Luis Benitez ("Benitez") and Juan Reyes ("Reyes") (collectively "Plaintiffs") bring this action against Defendant American Standard Circuits, Inc. ("Defendant" or "ASC"), each alleging claims of sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*  Plaintiffs also allege Illinois common law claims of assault, battery, and intentional infliction of emotional distress ("IIED").  Plaintiffs' claims stem from events that occurred during their employment with ASC. Presently before the Court are three motions: Defendant's motion for summary judgment on all of Plaintiff Benitez's claims, Defendant's motion for summary judgment on all of Plaintiff Reyes's claims, and Defendant's motion to sever, or alternatively, to bifurcate Plaintiffs' trials pursuant to Fed. R. Civ. P. 21 and 42.  For the reasons stated below, all three of Defendant's motions are DENIED.

*FACTUAL BACKGROUND*

Plaintiffs Benitez and Reyes are former employees of American Standard Circuits, Inc.

("ASC"), an Illinois corporation. (Defendant's Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment on All of Plaintiff Benitez's Claims ("DSOF-Benitez") ¶ 1.) Benitez and Reyes both worked at ASC's Franklin Park facility, which closed in March 2009. (*Id.*) Gordhan Patel ("Gordhan") is ASC's Chairman, Director, and Secretary, and Jay Hirpara ("Hirpara") is ASC's Vice President and Director. (*Id.*) From approximately September 21, 1998 until August 28, 2005, Jack Raida ("Raida") served as Plant Manager of ASC's Franklin Park facility. (*Id.* ¶ 3.) Succeeding Raida, Bhavesh Mehta ("Mehta") served as Plant Manager of the facility from approximately August 29, 2005 until the facility closed in March 2009. (*Id.* ¶ 2.) When Bhavesh Mehta became Plant Manager, Pravin Gondalia (also known as Manu Hirpara) ("Gondalia") served as the Second Shift Plant Manager. (*Id.* ¶ 4.) The Plant Manager supervised the entire facility, including the screening department, plating department, and maintenance department. (*Id.* ¶ 5.) Each department also had its own supervisor, although the precise responsibilities and powers of those "supervisors" are disputed. (Raida Dep. 18:21-22:1, Aug. 4, 2009.)

I.     **Plaintiff Benitez**

Plaintiff Benitez was employed in ASC's screening department from approximately February 17, 2003 until January 20, 2006. (DSOF-Benitez ¶ 16.) Throughout Benitez's employment, Bharat Patel ("Bharat") served as "Screening Supervisor," although his precise responsibilities and powers are disputed. (*Id.* ¶ 10.)

Benitez claims that he suffered several instances of unwanted sexual advances by Vijay Patel ("Vijay"), another ASC employee. (Plaintiff Benitez's Rule 56.1 Statement of Material Facts ("PSOF-Benitez") ¶ 3.) During Benitez's employment, Vijay worked as a mechanic in the maintenance department. (DSOF-Benitez ¶ 29.) Plaintiffs assert that Vijay was,

in fact, the supervisor of the maintenance department, though ASC disputes this claim. (PSOF-Benitez ¶ 33.) According to Benitez, around September or October of 2005, Vijay began making sexually explicit comments to him and groping his genital parts. (Benitez Dep. 220:15-222:22; 225:23-226:11, Dec. 23, 2008.) Benitez claims that, on one occasion toward the end of 2005, Vijay forced him to engage in oral sex and then asked Benitez to penetrate him. (*Id.* at 228:11-21.) Benitez claims that he refused to comply with Vijay's demands, told him to stop, and pushed him away. (*Id.* at 228:17-21; 240:21-24.) Benitez claims that he complained two or three times to his direct supervisor, Bharat Patel, about Vijay's advances, and he specifically reported Vijay's request that Benitez penetrate him. (*Id.* at 215:1-14; 238:8-20; Benitez Decl. ¶ 7.) According to Benitez, Bharat dismissed his complaints by laughing at him and telling him that he was crazy because Vijay was married and had children. (Benitez Dep. 215:1-14; 238:8-20; Benitez Decl. ¶ 7.)

Benitez asserts that, on January 18, 2006, Vijay lowered his pants, began touching Benitez's genital parts, and again asked Benitez to penetrate him. (Benitez Dep. 239:17-241:15.) According to Benitez, Vijay threatened that Benitez would be fired if he did not comply with Vijay's sexual demands. (*Id.*) Benitez claims that he refused Vijay's demands and complained to Bharat the next day. (*Id.*) According to Benitez, Bharat merely laughed and told him he was crazy. (*Id.* at 215:1-14; Benitez Decl. ¶ 7.) One day later, on January 20, 2006, ASC terminated Benitez's employment. (PSOF-Benitez ¶ 27.) On January 23, 2006, Benitez filed a police report with the Franklin Park Police Department regarding the incident with Vijay. (DSOF-Benitez ¶ 61.) The case was eventually closed without any criminal action taken because Benitez never followed up with the police department or cooperated with their attempted investigation.

(*Id.* ¶ 66.)  Benitez claims that he has suffered from depression, sleeplessness, and marital problems as a result of the incidents involving Vijay.  (PSOF-Benitez ¶ 5.)

Bharat denies that Benitez or any other employee ever complained to him about Vijay.  (Bharat Dep. 132:22-134:2, June 24, 2009.)  In addition, Vijay denies that he ever made any sexual advances toward Benitez.  (Vijay Dep. 96:19-100:20, July 15, 2009.)

## II.    Plaintiff Reyes

Plaintiff Reyes was employed in ASC's plating department from approximately February 9, 1998 until February 3, 2006.  (Defendant's Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment on All of Plaintiff Reyes's Claims ("DSOF-Reyes") ¶¶ 1-2.)  When Reyes began working at ASC, Raju Patel ("Raju") worked as an operator in the plating department, and Reyes served as a helper who assisted Raju.  (*Id.* ¶ 2.)  Eventually, Reyes became an operator in the plating department and held that position throughout the remainder of his employment at ASC.  (*Id.*)  Although the exact timeframe is unclear, during the latter part of Reyes's employment in the plating department, Amarat Patel ("Amarat") served as the "Plating Supervisor."  (*Id.* ¶ 10.)

Reyes claims that, throughout the eight years he worked for ASC, he was repeatedly groped by Vijay.  (*Id.* ¶ 24.)  Reyes claims that Vijay's advances began during the first week of Reyes's employment in February 1998.  (Reyes Dep. 170:14-22, Dec. 22, 2008; Def. ASC's First Amended Answer ¶ 20.)  According to Reyes, the first incident occurred when Raju directed him to assist Vijay in retrieving some tools, and Vijay grabbed Reyes's penis as the two were climbing a stairway to the tool room.  (Reyes Dep. 171:1-14; 172:4-19; Reyes Decl. ¶ 4.)  Reyes claims that he backed away from Vijay, descended the staircase, and returned to his work area, where he found Raju and another employee laughing.  (*Id.*)

Reyes claims that, throughout his employment at ASC, Vijay attempted to grope his genital parts two or three times per week. (Reyes Dep. 179:22-180:20.) According to Reyes, on one particular occasion between October and December 2005, when he went to retrieve a tool from the tool room, Vijay shut the tool room door and began grabbing Reyes's penis. (*Id.* at 175:22-177:7; 179:18-180:1.) Reyes claims that Vijay also spoke to him in English, and although Reyes did not understand Vijay's words because he does not speak English, Vijay's actions and mannerisms communicated that he wanted to have sex with Reyes. (Reyes Decl. ¶ 5.) Reyes claims that he responded defensively to Vijay's advances by trying not to let Vijay touch him, finding his way to the door, and exiting the tool room. (Reyes Dep. 178:10-23.)

According to Reyes, his final encounter with Vijay occurred on Saturday, January 14, 2006 around 9:00 a.m. Reyes claims that, during this incident, Vijay approached Reyes from behind while Reyes was holding a machine and grabbed Reyes's penis. (*Id.* at 154:7-157:8.) Reyes claims that when his supervisor, Amarat, saw Reyes pushing Vijay away, Amarat responded by telling Reyes in English that Vijay was a "fucking gay." (*Id.*) Amarat denies that this occurred, denies ever seeing Vijay touch another ASC employee inappropriately, and denies ever hearing about such conduct. (Amarat Dep. 109:22-115:19, June 25, 2009.) In addition, Vijay denies that he ever made any sexual advances toward, or inappropriately touched, Reyes. (Vijay Dep. 96:19-101:20.)

On January 28, 2006, Reyes went to the Franklin Park Police Department and filed a police report against Vijay about the incident that had occurred two weeks earlier and Vijay's conduct in general. (DSOF-Reyes ¶ 38; Dziewinski Decl. Ex. 1.) On January 30, 2006, the Franklin Park Police Department informed ASC that Benitez, Reyes, and another employee, Leo Hernandez, had filed police reports against Vijay. (DSOF-Reyes ¶ 20.) That same day, Gordhan

Patel ("Gordhan") and Jay Hirpara ("Hirpara") called Reyes into their office to discuss the incidents Reyes reported to the police. (*Id.* ¶ 52.) Another ASC employee, Ruffo Vazquez, translated the conversation for Reyes. (*Id.*) During this meeting, Gordhan and Hirpara instructed Reyes to contact the management if he had any problems at ASC in the future. (*Id.* ¶ 53.) According to Reyes, Gordhan and Hirpara also stated that he would be terminated if he did not drop his charges against Vijay. (Reyes Decl. ¶ 8.) Disputing Reyes's account, Vazquez claims that neither Gordhan nor Hirpara threatened to terminate Reyes during the meeting in which he served as an interpreter. (Vazquez Decl. ¶¶ 2-6, 9.)

On the same day, January 30, 2006, ASC issued a written warning to Vijay concerning the incidents reported to the police and stating that, "[a]fter the company investigation and the police investigation, there is no proof of the claims." (Plaintiff Reyes's Rule 56.1 Statement of Material Facts ("PSOF-Reyes") ¶ 20.) Reyes claims that no one from ASC spoke with either him or Benitez before issuing the warning to Vijay. (*Id.*) ASC disputes this claim. ASC admits, however, that it never took any other disciplinary measures against Vijay; ASC never suspended, demoted, or changed Vijay's responsibilities after the police reports were filed. *(Id.* ¶ 22.)

On February 3, 2006, ASC provided Reyes with a letter stating that the Franklin Park Police Department had informed ASC that Reyes needed to correct his social security number with the social security office. (*Id.* ¶ 25.) Throughout his employment at ASC, Reyes received letters from ASC approximately once a year stating that his social security number did not match the Social Security Administration's records and instructing him to correct the discrepancy. (DSOF-Reyes ¶¶ 60-61.) The February 3 letter resembled the letters Reyes had previously received except that where the old letters stated "the Social Security records we have on file are not accurate," the February 3 letter added "the Franklin Park Police Department brought it to our

attention." (*Id.* ¶ 66.)  Gordhan testified that he instructed the office manager to prepare the February 3 letter because Officer Joseph Vallejo, the Franklin Park police officer charged with investigating Reyes's police report, had informed him that Reyes's social security number did not match the Social Security Administration's records.  (*Id.* ¶ 26.)  Vallejo, however, denies that he ever investigated Reyes's social security number or reported any issues related to Reyes's social security records to ASC.  (Vallejo Dep. 37:19-38:12.)

Reyes claims that when he received the February 3 letter, his department supervisor, Amarat, instructed him not to return work until he corrected the problem with his social security number.  (Reyes Dep. 129:5-12; 132:8-12; 134:5-7; Reyes Decl. ¶ 11.)  Furthermore, Reyes claims that Amarat made him understand that he was being terminated.  (*Id.*)  According to Reyes, since he understood that he was being terminated, he completed a form requesting to be paid the vacation compensation he was owed.  (Reyes Dep. 136:8-18; Reyes Decl. ¶ 13.)  Reyes claims that Amarat signed and approved his request.  (*Id.*)  According to Reyes, when he later returned to collect his pay check, Amarat instructed him to sign a letter of resignation.  (Reyes Dep. 244:16-146:4; Reyes Decl. ¶ 13.)  Reyes claims that he refused to sign the letter, stating that he was not resigning and wanted to come back to work, but Amarat replied that he could not return to work.  (*Id.*)  Amarat disputes Reyes's account and denies that he ever terminated Reyes.  (Amarat Dep. 45:23-46:14.)  According to ASC, Reyes simply took vacation from February 6 to February 20, 2006 and voluntarily failed to return to work after his vacation.  (DSOF-Reyes ¶¶ 68-69).

### III.    Procedural Posture

Plaintiffs Benitez and Reyes initially brought this lawsuit against ASC and Vijay Patel,

alleging both state law tort claims and violations of Title VII. On October 1, 2009, Vijay Patel was dismissed as a party. Benitez's remaining claims against ASC include: assault (Count II); battery (Count IV); intentional infliction of emotional distress (Count VI); sexual harassment in violation of Title VII (Count XIV); and retaliation in violation of Title VII (Count XV). ASC currently moves for summary judgment on all of Benitez's claims. Reyes's remaining claims against ASC include: assault (Count I); battery (Count III); intentional infliction of emotional distress (Count V); sexual harassment in violation of Title VII (Count XVI); and retaliation in violation of Title VII (Count XVII). ASC currently moves for summary judgment on all of Reyes's claims as well. Before this Court are both of ASC's motions for summary judgment and ASC's motion to sever or, alternatively, to bifurcate Plaintiffs' trials. The Court first considers ASC's motions for summary judgment.

## SUMMARY JUDGMENT ANALYSIS

### I.     Standing

As an initial matter, ASC argues that neither plaintiff has standing to bring this case. ASC rests this argument on Benitez's admission that he has also been known as Jose Luis Benitez Leon and works for his current employer under another name, and Reyes's admission that he has also been known as Juan Reyes Roman. The Court disagrees with ASC's assertion that neither plaintiff has standing and finds the cases cited by ASC inapposite. *See Dotson v. Bravo*, 321 F.3d 663 (7th Cir. 2003); *Martin v. Brock*, No. 07 C 3154, 2007 U.S. Dist. LEXIS 57207, at *9 (N.D. Ill. July 19, 2007). These cases deal with plaintiffs who, unlike Benitez or Reyes, purposefully thwarted the judicial process and therefore warranted the severe sanction of dismissal. *See id.*   Additionally, for the first time in each reply brief, ASC introduces the argument that *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S.

137, 152 (2002), governs this case.  Any argument raised for the first time in a reply brief is deemed waived.  *Baker v. America's Mortgage Servicing, Inc.*, 58 F.3d 321, 325 (7th Cir. 1995).  Moreover, the Court explicitly barred ASC from seeking the evidence necessary to advance this argument, and ASC may not flout this Order.  (*See* Dkt. 78, 3/03/09 Order.)

## II.     Motions to Strike

In resolving Defendant's motions for summary judgment, the Court considered Defendant's motions to strike portions of Plaintiffs' additional material facts and the evidence on which these facts rely.  Because the Court bases its ruling on admissible evidence pursuant to Fed. R. Civ. P. 56, the Court need not rule separately on Defendants' motions to strike.  Additionally, Plaintiffs move to strike Defendant's reply memorandum in support of its motion for summary judgment on Plaintiff Benitez's claims and Defendant's purported "replies" to Plaintiffs' Rule 56.1(b)(3)(B) responses to Defendant's statements of material facts.  Plaintiffs correctly assert that Defendant's reply memorandum exceeds the 15-page limit imposed by Local Rule 7.1, and the Court therefore strikes all pages in excess of the page limit.  In addition, the Court strikes Defendant's purported "replies" to Plaintiffs' Rule 56.1(b)(3)(B) responses to Defendant's Statements of Material Facts, as Plaintiffs correctly note that neither Local Rule 56.1 nor this Court's Standing Order on Motions for Summary Judgment provide for such documents to be filed.

## III.     Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 252.

When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

## IV.    Title VII: Hostile Environment Sexual Harassment

ASC moves for summary judgment on both Benitez's and Reyes's hostile work environment claims, arguing that both plaintiffs fail to establish the elements necessary to support their claims. Title VII prohibits an employer from discriminating against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). This provision implicitly protects an employee from sexual harassment that is either severe or pervasive enough to create a hostile work environment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). For an employee to survive summary judgment under the theory that he was subjected to a hostile work environment in violation of

Title VII, he must demonstrate that: (1) he was subjected to unwelcome conduct of a sexual nature; (2) the conduct was directed at him because of his sex; (2) the conduct was severe or pervasive enough to create a hostile work environment; and (4) there is a basis for employer liability. *Roby v. CWI, Inc.*, 579 F.3d 779, 784 (7th Cir. 2009). As discussed below, Plaintiffs raise a genuine issue of material fact as to each element of their hostile work environment claims.

### a. "Unwelcome conduct of a sexual nature"

Under the first element necessary to establish a hostile work environment claim, Plaintiffs must demonstrate that they were subjected to unwelcome conduct of a sexual nature. ASC argues that the sexual harassment Benitez allegedly experienced was not unwelcome because he did not say "no" to Vijay's purported advances. Benitez testified at his deposition that he *did* say "no" and that he attempted to push Vijay away each time Vijay approached him. (Benitez Dep. 228:6-21; 230:16-18; 240:9-241:3.) In any event, the inquiry does not focus on whether Benitez voluntarily participated in the sexual episodes; rather, the court must analyze whether a plaintiff "by [his] conduct indicated that the sexual advances were unwelcome." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986); *see also Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1011 (7th Cir. 1994) ("A plaintiff's words, deeds, and deportment can cast light on whether her coworkers' treatment of her was unwelcome and should have been perceived as such by them and their supervisors."). Benitez's words and conduct raise a triable issue of fact as to whether Vijay's alleged sexual advances were unwelcome. Similarly, Reyes claims that he responded to Vijay's advances by pushing him away and attempting to escape his contact, raising a triable issue as to whether Vijay's alleged advances were unwelcome to him as well. (Reyes Dep. 154:7-157:8; 178:10-23.) At the very least, "whether

particular conduct was unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact."  *Meritor*, 477 U.S. at 68; *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004).

>   **b.**      **Conduct was "based on sex"**

The second element a plaintiff must establish to assert a prima facie case of hostile work environment sexual harassment is that the harassment was based on his sex.  To be actionable under Title VII, same-sex harassment must occur "because of" the plaintiff's sex.  *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1084 (7th Cir. 2000).  A plaintiff may establish that same-sex sexual harassment has occurred "because of sex" in a number of ways that include demonstrating that such harassment is motivated by sexual desire.  *Oncale v. Sunflower Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1008 (7th Cir. 1999) (quoting *Oncale*) (internal quotation marks omitted) (inference of sexual discrimination can be drawn when the harasser made "explicit or implicit proposals of sexual activity" to persons of the same gender, and there existed "credible evidence that the harasser was homosexual").  A reasonable trier of fact could find that Vijay's alleged acts of forcing Benitez to engage in oral sex, propositioning him for sex, and groping Reyes's genital parts were motivated by sexual desire.  *See Oncale*, 523 U.S. at 81.  Accordingly, Plaintiffs survive summary judgment on the issue of whether Vijay's alleged conduct was "based on sex."

>   **c.   Conduct was "severe or pervasive"[1]**

The third element of a hostile work environment claim requires the plaintiff to demonstrate that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment.  To determine whether a plaintiff's showing satisfies this standard at the

---

[1] In support of both motions for summary judgment currently at issue, ASC posits that a workplace must be "hellish" to constitute a hostile work environment.  However, the Seventh Circuit has recognized that "something short of the Ninth Ring may violate the statute."  *Jackson v. Racine*, 474 F.3d 493, 500 (7th Cir. 2007).

summary judgment stage, the court must consider all circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Jackson v. Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (quoting *Moser v. Indiana Dept. of Corr.*, 406 F.3d 895, 902 (7th Cir. 2005)). When conducting this inquiry, the court evaluates whether the alleged harassment was "both subjectively and objectively offensive." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009).

To violate Title VII, sexual harassment need not be both severe *and* pervasive. *Jackson*, 474 F.3d at 499. "One instance of conduct that is sufficiently severe may be enough." *Id.*; *Patton v. Keystone RV Co.*, 455 F.3d 812, 817 (7th Cir. 2006), and in particular, the Seventh Circuit has repeatedly recognized that "direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment." *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001). Echoing this sentiment in *Patton*, the Court noted that "[w]hen entering a workplace, reasonable people expect to have their autonomy circumscribed in a number of ways; but giving up control over who can touch their body is usually not one of them." *Patton*, 455 F.3d at 816. A hostile work environment therefore exists where plaintiffs have established incidents involving direct contact with an intimate body part. *See Patton*, 455 F.3d at 817; *Worth*, 276 F.3d at 268.

Benitez alleges several instances of direct contact with an intimate body part, the most severe of which involved forced oral sex. Even though Benitez alleges only a few incidents of unwanted touching and requests for sex, these incidents—and perhaps the forced oral sex alone—are severe enough to constitute a hostile work environment in violation of Title VII. Indeed, in cases such as *Worth* and *Patton*, the Seventh Circuit concluded that plaintiffs experienced hostile work environments under facts substantially less egregious than those

alleged by Benitez. *See Patton*, 455 F.3d at 817 (placing his hand up the plaintiff's shorts and touching her underwear was equivalent to the actionable harassment in *Worth*, and if the harasser "touched her vagina, then his conduct would constitute not only actionable sexual harassment but possibly criminal sexual assault as well"); *Worth*, 276 F.3d at 268 (touching of an employee's breast for several seconds, near the nipple, was enough to constitute a hostile work environment by itself).

Reyes, in contrast to Benitez, alleges less severe conduct that occurred more frequently. According to Reyes, Benitez groped his genital parts on a few occasions but attempted to grope him two or three times per week throughout Reyes's eight years of employment at ASC. ASC argues that Reyes's claims amount to "isolated and innocuous" incidents that are insufficient to support a hostile work environment claim. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1456 (7th Cir. 1995). This argument, however, fails to adequately account for the frequency of Vijay's alleged actions. In determining whether conduct creates a hostile work environment, courts weigh the severity and pervasiveness of the conduct; although one particularly severe act may be enough to create a hostile work environment alone, "[c]onversely, conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson*, 474 F.3d at 499. By alleging that Vijay attempted to grope Reyes's genital parts two or three times a week, Reyes has raised a genuine issue of material fact as to whether he experienced harassment sufficiently severe or pervasive so as to alter the conditions of his employment.

### d.  Employer liability

The fourth requirement for establishing a hostile work environment claim is the existence of a basis for employer liability. The standard for employer liability depends on whether the

alleged harasser is the plaintiff's supervisor or a coworker. "Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense in the event the plaintiff suffered no tangible employment action." *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 500 (7th Cir. 2004). In contrast, an employer is only liable for harassment perpetrated by an employee who was not the plaintiff's supervisor if the employer was "negligent either in discovering or remedying the harassment." *Phelan v. Cook County*, 463 F.3d 773, 783 (7th Cir. 2006) (citing *Rhodes*, 359 F.3d at 506) (quotation marks omitted). Because it is undisputed that Vijay did not serve as either Plaintiff's supervisor, the Court applies a negligence standard to determine whether ASC may be held liable for Vijay's alleged conduct.

Where the alleged harasser is the plaintiff's coworker, an employer discharges its legal duty "if it takes reasonable steps to discover and rectify acts of sexual harassment by its employees." *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1035 (7th Cir. 1998). To perform this duty, an employer must first have notice of the harassment. *Id.* In determining whether the employer had such notice, the court considers "whether the employer has designated a channel for complaints," by, for example, identifying a "point person" to accept complaints. *Id.* (citing *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997)). With respect to the content of an employer's notice, a plaintiff "cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Id.* (quoting *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996)).

To establish that his employer had notice, a plaintiff can "offer evidence either that []he notified the employer about the harassment or that the harassment was so pervasive that a jury may infer that the employer knew about it." *Bombaci v. Journal Community Publishing Group*,

482 F.3d 979, 983-84 (7th Cir. 2007) (citing *Zimmerman*, 96 F.3d at 1018-19); *Rhodes*, 359 F.3d at 507 ("we could charge an employer with constructive notice where the harassment is sufficiently obvious").  Also, a complaint from someone other than the victim may provide an employer with notice of sexual harassment.  *Zimmerman*, 96 F.3d at 1019.  Without notice of harassment, "the law does not require an employer to do more than promote general anti-harassment policies and training to ensure compliance with Title VII."  *Id.*

Plaintiffs have offered sufficient evidence that ASC was "negligent either in discovering or remedying the harassment" allegedly directed at them, and they therefore survive summary judgment on this issue.  *See Rhodes*, 359 F.3d at 506.  As an initial matter, a reasonable jury could find that ASC had not established an adequate policy for preventing and addressing sexual harassment.  Although ASC's employee handbook contained a policy prohibiting harassment and encouraging employees to report any related problems to management, it is not clear that ASC actually put this policy into practice.  ASC's workforce comprises employees who speak a variety of languages; for example, Amarat Patel and Bharat Patel speak Gujarati, a Hindu dialect, while Benitez and Reyes speak Spanish.  Despite the myriad languages spoken by ASC's employees, the company's employee handbook is printed only in English.  Not surprisingly, although Amarat remembers providing Reyes with the employee handbook, he is unable to recall explaining ASC's sexual harassment policy to Reyes during his orientation—or even the substance of the policy itself.  (Amarat Dep. 51:18-54:10.)  Reyes, in turn, may have received the employee handbook, but he claims that he could not understand the handbook because it was written in English, and neither Amarat nor any other ASC employee ever explained to him the policies outlined in the handbook.  (Reyes 65:19-67:1.)  Similarly, neither Bharat nor anyone

else ever explained ASC's sexual harassment policy to Benitez in Spanish. (Benitez Dep. 146:11-149:2.)

Additionally, although ASC's employee handbook formally described an "open door" policy encouraging employees to report harassment to the management, the evidence presented by Plaintiffs casts doubt upon ASC's actual implementation of this policy. Several ASC employees claim that they feared ASC would terminate their employment if they reported claims of sexual harassment to the management. (Magana Dep. 89:13-15; 91:23-92:2, Aug. 12, 2009; Cristobal Reyes Dep. 203:4-7, Mar. 17, 2009; Alvarez Dep. 39:11-23; 74:12-16, May 22, 2009.) Reyes, in particular, asserts that he feared ASC would fire him if he reported the harassment he allegedly suffered, and indeed, a reasonable trier of fact may find that once Reyes *did* complain about this harassment, his precise fears were realized. (Reyes Dep. 169:22-170:13.)

More importantly, Plaintiffs raise genuine issues of material fact as to whether ASC's department heads had notice of Vijay's conduct and failed to take appropriate remedial action. Benitez claims that he told his supervisor, Bharat, about Vijay's alleged harassment several times, and Bharat responded by simply laughing at him. (Benitez Dep. 215:1-14; 238:8-20.) Although Reyes admits that he never complained directly about Vijay's alleged harassment to a management-level employee, Plaintiffs claim that ASC had constructive notice of Vijay's alleged conduct because it was pervasive and obvious. *See Bombaci*, 482 F.3d at 983-84 (citing *Zimmerman*, 96 F.3d at 1018-19); *Rhodes*, 359 F.3d at 507. In particular, Reyes claims that Amarat witnessed Vijay grab Reyes's genital parts and Reyes push Vijay away, and Amarat responded by merely exclaiming that Vijay was a "fucking gay." (Reyes Dep. 154:7-157:8.) Further supporting the argument that ASC had constructive—if not actual—notice of Vijay's conduct, Plaintiffs present evidence that several other ASC employees were sexually harassed by

Vijay.  Three employees, whose employment at ASC collectively spanned from 1998 to 2008, claim that Vijay groped their genital parts and engaged in other sexual misconduct on numerous occasions.  (PSOF-Benitez ¶¶ 9-14.)  Additionally, two of these employees claim that their supervisors laughed when they became aware of Vijay's behavior.  (*Id.* ¶¶ 10, 18.)

Notice to an employee of sexual harassment—whether actual or constructive[2]—is deemed notice to the corporation when information has either:

> (1) come to the attention of someone who (a) has under the terms of his employment, or (b) is reasonably believed to have, or (c) is reasonably charged by law with having, a duty to pass on the information to someone within the company who has the power to do something about it; or (2) come to the attention of such a someone.

*Young*, 123 F.3d at 674.  The inquiry under (1)(a) begins by "identifying the person who has the duty under the employer's rules to channel complaints of sexual harassment to the employees of the company who are empowered to act upon such a complaint."  *Id.*  ASC's sexual harassment policy provides that "any employee who feels harassed is required to immediately and personally report the harassment to any one of the following people: President, *Supervisor* or Manager, Any Company Representative."  (Benitez Dep., Ex. 7, ASC Employee Handbook 10) (emphasis added).  It is undisputed that Bharat held the formal title of Supervisor of the Screening Department, and Amarat served as Supervisor of the Plating Department.  Because of their titles and responsibilities for overseeing their respective departments, Bharat and Amarat could reasonably be considered the "Supervisors" intended to receive employees' sexual harassment complaints under ASC's policy.  Accordingly, under prong (1)(a) of the analysis prescribed by the Seventh Circuit, notice to Bharat and Amarat was notice to ASC.

---

[2] Employees alleging sexual harassment need not complain to the appropriate company representatives directly.  If harassment is sufficiently pervasive, it is presumed "to have come to the attention of someone authorized to do something about it."  *Young*, 123 F.3d at 674 (citing *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992)).

If there is any doubt that ASC formally designated Bharat and Amarat to receive sexual harassment complaints, the inquiry turns to "who in the company the complainant *reasonably believed* was authorized to receive and forward (or respond to) a complaint of harassment." *Young*, 123 F.3d at 674 (emphasis in original). Plaintiffs satisfy this standard as well. Addressing facts similar to those at hand, the Seventh Circuit explained in *Young v. Bayer Corp.* that:

> A department head would ordinarily be such a someone with regard to complaints of misconduct lodged by a worker in his department. If he receives such a complaint he would be obligated by elementary principles of management and good sense either to resolve the problem himself or to refer it to someone else within the company, who can.

*Id.* at 674-75. Bharat and Amarat each served as department heads, and if ASC did not officially designate them to receive complaints of sexual harassment, they informally assumed this responsibility by virtue of employees' "reasonable belief" in their authority to address such complaints. Under either prong of the analysis set forth by the Seventh Circuit, notice to Bharat and Amarat constituted notice to ASC. Because Plaintiffs raise a genuine issue of material fact as to whether Bharat and Amarat had notice of Vijay's alleged harassment, summary judgment on the issue of ASC's negligence is denied.[3]

## V.     Title VII: Retaliation

ASC next moves for summary judgment on both Benitez's and Reyes's retaliation claims. Title VII forbids an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C.

---

[3] It is also worth noting that even if Vijay was neither Plaintiff's direct supervisor, and ASC is therefore not *strictly* liable for his actions, a reasonable jury could conclude that Vijay was the maintenance department supervisor and impose a higher duty of care on ASC as a result of Vijay's position of authority. *Doe v. Oberweis Dairy*, 456 F.3d 704, 717 (7th Cir. 2006) ("the cases implicitly impose on the employer a higher duty of care to protect its employees against those employees whom the employer has armed with authority, even if it is less than the authority that triggers the employer's strict liability").

§ 2000e-3(a). A plaintiff can establish a prima facie case of retaliation in one of two ways: the "direct method" or the "indirect method." *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Under the direct method, a plaintiff must present evidence, direct or circumstantial, demonstrating that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) a causal link connects the two. *Id.* Alternatively, a plaintiff may proceed under the indirect method by establishing that: (1) he engaged in statutorily protected activity; (2) he met his employer's legitimate expectations; (3) despite his satisfactory performance, he suffered a materially adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engaged in statutorily protected activity. *Id.*

If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a nondiscrimatory reason for its action. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009).[4] If the defendant clears this hurdle, then "the plaintiff must show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual to avoid summary judgment against it." *Id.* If an employee is unable to "cast doubt on an employer's nonretaliatory explanation," his retaliation claim must fail. *Id.* (citing *Agyropoulos*, 539 F.3d at 736 n.6) (internal quotation marks omitted).

### a. Plaintiff Benitez's Retaliation Claim

ASC argues that Plaintiff Benitez fails to establish a claim of retaliation under either the direct or indirect method. At the outset, there is a factual dispute as to whether Benitez engaged in statutorily protected activity, which is relevant to either method of establishing a retaliation claim. Benitez contends that he complained several times to his direct supervisor, Bharat, about

---

[4] Although courts most frequently evaluate the legitimacy of an employer's explanation for subjecting an employee to an adverse employment action under the indirect method, "an employee's failure to cast doubt on an employer's nonretaliatory explanation will also doom a retaliation claim under the direct method." *Agyropoulos*, 539 F.3d at 736 n.6; *see also Culver*, 416 F.3d at 546 (proceeding to analyze the employer's explanation after the plaintiff established a prima facie case of retaliation under the direct method).

Vijay's advances and that he specifically reported Vijay's request that Benitez penetrate him. (Benitez Dep. 215:1-14; 238:8-20; Benitez Decl. ¶ 7.) Bharat, in contrast, denies that Benitez ever complained to him about Vijay. Because "statutorily protected activity 'can range from filing formal charges *to voicing informal complaints to superiors*,'" a trier of fact could reasonably find that Benitez engaged in statutorily protected activity if he complained to Bharat. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (citing *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) (emphasis added by the court in *Casna*)).

Under the direct method, after establishing that he engaged in statutorily protected activity, Benitez must demonstrate that he suffered a materially adverse action, and that a causal link connects the protected activity to ASC's action. "A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005). Benitez argues that the close temporal proximity between his last complaint to Bharat and his termination establishes a causal link connecting the two events. Specifically, Benitez claims that, on January 19, 2006, he complained to Bharat that Vijay was touching his genital parts and suggested further that Bharat hide so Benitez could call Vijay over, and Bharat could witness Vijay touching him. (Benitez Dep. 215:1-14; Benitez Decl. ¶ 7.) According to Benitez, Bharat merely laughed at him and dismissed his suggestion. (*Id.*) On January 20, 2006, the day after Benitez allegedly complained to Bharat, ASC terminated Benitez's employment. Suspicious timing, on its own, is rarely enough to create a triable issue. *Casna*, 574 F.3d at 427; *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006). However, "in an extreme case like this, where the adverse impact comes 'on the heels' of the protected activity, it is." *Casna*, 574 F.3d at 427 (internal citations omitted); *see also*

*McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997) (finding that suspicious timing alone was enough to establish a causal link when the plaintiff was fired two days after engaging in statutorily protected activity). Benitez has therefore satisfied the causation requirement under the direct method of proving a prima facie case of retaliation.[5]

Since Benitez has succeeded in presenting a prima facie case of retaliation, the burden shifts to ASC to prove by a preponderance of evidence that it would have terminated Benitez absent his complaints of sexual harassment. The trier of fact normally determines the persuasiveness of an employer's explanation unless the court concludes, without reservation, that a reasonable trier of fact would be compelled to find the employer's explanation credible. *See Culver*, 416 F.3d at 546 (citing *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997)). "Summary judgment should be granted only if the defendant 'presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive.'" *Id.* (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).

ASC contends that its decision to terminate Benitez's employment was based on legitimate, nondiscriminatory reasons—namely, Benitez's alleged failure to comply with instructions to perform priority jobs before other jobs. However, genuine issues of material fact preclude the Court from finding, without reservation, that this explanation is credible. *See Culver*, 416 F.3d at 546. Bhavesh Mehta, ASC's plant manager, explained that Benitez was terminated for failing to follow orders issued by the second shift manager, Pravin Gondalia, to perform a priority job on January 18, 2006, two days before he was terminated. (Mehta Dep.

---

[5] The Court need not explore whether Benitez also establishes a prima facie case of retaliation under the indirect method. *See Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 666 (7th Cir. 2006) (holding that once a plaintiff has satisfied the direct method of establishing retaliation, there is no need to evaluate the case under the indirect method); *EEOC v. C.G. Schmidt, Inc.*, No. 08-CV-173, 2009 WL 3754160, at *9 (E.D. Wis. Nov. 5, 2009) (holding that, where the plaintiff's evidence creates a genuine issue of fact under the direct method, the court need not also employ the indirect method).

148:21-155:3.)  According to Mehta, he and the owners, Jay Hirpara and Gordhan Patal, decided

to fire Benitez because he was not following instructions, and they doubted that his behavior

would change.  (Mehta Dep. 148:21-155:3.)  Benitez denies that he failed to comply with

Gondalia's orders on January 18, 2006.  (Benitez Decl. ¶ 6.)  Moreover, the parties dispute the

quality of Benitez's performance in general.  While Gondalia testified at his deposition that he

complained to Mehta about Benitez's performance roughly twice a week, neither Gondalia nor

Mehta support their claims that Benitez consistently failed to follow instructions with references

to any specific incidents.  (*See* Mehta Dep. 148:21-155:3; Gondalia Dep. 51:3-52:4.)  Benitez

admits to two clashes with management during the course of his employment at ASC—one

incident involving a discussion with Mehta about respecting employees, and another incident in

which Hirpara asked Benitez to do a priority "hot job" while he was on his unpaid lunch break

and later apologized for this request.  (PSOF-Benitez ¶¶ 28, 30.)  Despite these incidents, it is

undisputed that Benitez never received a written warning while he was employed at ASC.  (*Id.* at

¶ 29.)  Benitez claims, additionally, that his direct supervisor, Bharat, occasionally praised him

for doing a good job and rewarded him by paying for his lunch.  (*Id.*)  Because ASC has failed to

offer uncontradicted evidence that it would have terminated Benitez absent his complaint of

sexual harassment, the Court must defer to the trier of fact to evaluate ASC's credibility on this

issue.  Accordingly, summary judgment on Benitez's retaliation claim is denied.

### b.  Plaintiff Reyes's Retaliation Claim

The existence of multiple factual disputes also precludes the Court from granting

summary judgment for ASC on Plaintiff Reyes's retaliation claim.  Reyes, like Benitez, succeeds

in establishing a case of retaliation under the direct method, which requires proof that: (1) Reyes

engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) a

causal link connects the two. *Argyropoulos*, 539 F.3d at 733. As an initial matter, Reyes clearly engaged in statutorily protected activity when he filed a complaint with the Franklin Park Police Department regarding Vijay's alleged sexual misconduct. *See Worth*, 276 F.3d at 265. However, the parties genuinely dispute the second two elements required to prove a prima facie case of retaliation under the direct method.

ASC argues that Reyes did not suffer any materially adverse action because he was not terminated. According to ASC, Reyes simply failed to return to work after a two-week vacation. (DSOF-Reyes ¶¶ 68-69). Reyes, however, presents a very different story. Reyes claims that, two days after he filed a complaint with the police department, Gordhan and Hirpara threatened to terminate his employment if he refused to drop this complaint. (Reyes Decl. ¶ 8.) Four days after Gordhan and Hirpara issued this threat, ASC provided Reyes with a letter claiming that the police department reported that Reyes's social security number was invalid. (DSOF-Reyes ¶ 26.) Reyes offers evidence that the police department made no such report. (Vallejo Dep. 37:19-38:12.) He also claims that his supervisor, Amarat, instructed him not to return to work until he corrected the problem with his social security number and made him understand that he was being fired. (Reyes Dep. 129:5-12; 132:8-12; 134:5-7; Reyes Decl. ¶ 11.) According to Reyes, because he understood that he was being terminated, he completed a vacation request form in order to collect the vacation pay that ASC owed him. (Reyes Dep. 136:8-18; Reyes Decl. ¶ 13.) Based on the evidence adduced by Reyes, a reasonable trier of fact could find that ASC subjected Reyes to an adverse employment action by terminating his employment.

Next, ASC argues that Reyes has failed to satisfy the third element required to establish a prima facie case of retaliation—that he demonstrate a causal link connecting protected activity to an adverse employment action. Reyes argues that the suspicious timing of his firing, plus

additional circumstantial evidence, demonstrates such a link. While the four days separating

Reyes's complaint to the police department and his alleged termination may not be enough to

create a triable issue, "[s]uspicious timing is . . . 'often an important evidentiary ally of the

plaintiff.'" *Culver*, 416 F.3d at 546 (quoting *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728

(7th Cir. 2003). Suspicious timing, combined with additional evidence that supports the

inference of a causal link, may permit the plaintiff to survive summary judgment. *Culver*, 416

F.3d at 546. Here, Reyes offers such additional evidence. As discussed above, Reyes claims

that ASC threatened to terminate Reyes's employment if he failed to drop his complaint against

Vijay. When viewed in the light most favorable to Reyes, this additional evidence, together with

the suspicious timing of Reyes's alleged termination, creates a triable inference of causation.

Because Reyes has established a prima facie case of retaliation,[6] the burden shifts to ASC

to offer unrebutted evidence that it would have taken an adverse employment action against

Reyes absent his complaint to the police department. *See id.* This analysis is thwarted at the

outset by the parties' genuine dispute as to whether Reyes was terminated. Apparently

attempting to work around this obstacle to meet its burden, ASC argues that it "had a legitimate

business reason for classifying Reyes's actions as a voluntary resignation." Def.'s Mem. in

Supp. of Mot. for Summ. J. 15. Despite ASC's attempt, the Court cannot reach this argument

without first determining whether Reyes was terminated. Because Reyes presents evidence

sufficient to allow the trier of fact to conclude that ASC retaliated against him in violation of

Title VII, summary judgment on Reyes's retaliation claim is denied.

### VI.    State Law Tort Claims

ASC next moves for summary judgment on Plaintiffs' claims that ASC is liable for

---

[6] As explained in more detail *supra* n. 5, because Reyes survives summary judgment under the direct method of establishing a retaliation claim, the Court need not evaluate Reyes's case under the indirect method.

Vijay's alleged state law tort claims of battery, assault, and intentional infliction of emotional distress ("IIED").  ASC argues that summary judgment on Plaintiffs' state law tort claims is warranted because: (1) there is no basis for employer liability; (2) Plaintiffs cannot establish valid tort claims against ASC; (3) Plaintiffs' state law tort claims are preempted by the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/1 *et seq.*; and (4) these claims are preempted by the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/8-111(c).  The Court takes each of these arguments in turn.

### a.   Direct employer liability for state law torts and IWCA preemption

ASC presents two related arguments in support of its motions for summary judgment on Plaintiffs' state law tort claims: (1) it cannot be held directly liable for Vijays's alleged torts, and (2) Plaintiffs' tort claims are preempted by the IWCA.  Because these arguments are interconnected, the Court addresses them together.  Central to each issue is the principle that an employer can be held *directly liable* "for those torts committed against one employee by another . . . that the employer could have prevented by reasonable care in hiring, supervising, or if necessary firing the tortfeasor."  *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1422 (7th Cir. 1986).  As a corollary, "an employer who has reason to know that one of his employees is being harassed in the workplace by others . . . and does nothing about it, is blameworthy."  *Id.*; *See also Thomas v. Habitat Co.*, 213 F.Supp.2d 887, 892 (N.D. Ill. 2002) ("Several courts in this district have acknowledged that 'management's knowledge coupled with lack of follow-up action is equivalent to express authorization of injurious conduct.'") (quoting *Quela v. Payco-General American Credits, Inc.*, 84 F.Supp.2d 956, 960 (N.D. Ill. 2000)); *Mobley v. Kelly Kean Nissan, Inc.*, 864 F.Supp. 726, 730 (N.D. Ill. 1993); *Cline v. General Elec. Capital Auto Lease, Inc.*, 757 F.Supp. 923, 931 (N.D. Ill. 1991).

Several issues of fact prevent the Court from granting summary judgment for ASC on this issue. As discussed above, with reference to Plaintiffs' hostile work environment claims, Plaintiffs have raised a genuine issue of material fact as to whether ASC had notice of Vijay's alleged conduct. Plaintiffs have presented evidence that department supervisors including Bharat Patel and Amarat Patel were aware of Vijay's behavior and failed to take remedial action. Even if Bharat and Amarat were aware of Vijay's behavior, a factual dispute exists as to whether their knowledge may be imputed to ASC for purposes of holding the company directly liability for Vijay's alleged torts. ASC contends that the only employee holding any real authority was the plant manager, Bhavesh Mehta, while all department supervisors were merely "working lead people." (*See* DSOF-Benitez ¶ 9; DSOF-Reyes ¶ 9.) However, Plaintiffs offer evidence from which a trier of fact could conclude that the department supervisors had greater authority than ASC admits. This evidence suggests that the department supervisors, including Bharat, Amarat, and Vijay, himself, had the authority to issue written and verbal warnings to employees, hire, and fire employees. (*See* PSOF-Benitez ¶¶ 34-36.) Accordingly, the Court finds ASC's assertion that only the plant manager possessed any of these powers hard to swallow and concludes that the trier of fact must determine the more precise contours of the department supervisors' authority. Because the trier of fact could reasonably find that ASC's department supervisors knew of Vijay's alleged misconduct, and their knowledge and subsequent inaction may be imputed to ASC, summary judgment on the issue of ASC's direct liability for Plaintiffs' tort claims must be denied.

ASC also raises a related argument that Plaintiffs' state law tort claims are preempted by the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/1 *et seq*. The IWCA provides the exclusive remedy for "accidental" injuries suffered by employees in the workplace.

*Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1016 (7th

Cir. 1997) (citing *Meerbrey v. Marshall Field and Co.*, 139 N.E.2d 1222 (Ill. 1990)).  ASC

argues that the injuries Plaintiffs allege are "accidental" and therefore preempted by the IWCA

because injuries intentionally inflicted by a co-worker may be unexpected from the perspective

of the employer or the injured employee.  *Meerbrey*, 139 N.E.2d at 1226.  However, this is only

true to the extent that "the employer did not intentionally inflict the injury upon the employee,

did not command or expressly authorize the injury or as long as the co-employee was not acting

as the alter ego of the employer."  *Watkins v. Woodlawn Cmty. Dev. Corp.*, No. 05 C 4051, 2006

U.S. Dist. LEXIS 3055, at *8 (N.D. Ill. Jan. 25, 2006) (citing *Meerbrey*, 139 N.E.2d at 1226).

As discussed above, Plaintiffs have raised genuine issues of material fact as to whether

ASC "expressly authorized" Vijay's alleged misconduct through the department supervisors'

awareness of—and failure to remediate—this misconduct.  Additionally, "as acts of sexual

harassment or other misconduct become more frequent and recur over an extended period of

time, it becomes more difficult to describe such acts as 'accidents'. . . and more plausible to

characterize them as the intended policy of the employer itself."  *Crissman v. Healthco Int'l,*

*Inc.*, No. 89 C 8298, 1992 U.S. Dist. LEXIS 13167, at *27 (N.D. Ill. Sept. 2, 1992.)  Plaintiffs

have presented evidence from which a trier of fact could conclude that Vijay's tortious conduct

spanned multiple years and victims, despite the awareness and inaction of several management-

level employees.  It strains credulity to conclude that the resulting injuries could be considered

"accidental" from ASC's perspective.  *See id.* at 30-31 (holding that "evidence indicating the

knowledge and involvement of higher managerial employees . . . and the recurrent nature of the

acts of which [plaintiff] complains is sufficient to create a question of fact" as to whether the

injuries alleged were "intentional" within the meaning of the IWCA).  Accordingly, Plaintiffs

raise a genuine issue of material fact as to whether their state law tort claims are barred by the IWCA.

### b. Elements of state law tort claims

ASC next argues that Plaintiffs cannot establish valid state law tort claims against ASC. Under Illinois common law, a civil assault is defined as "an intentional, unlawful offer of corporeal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the present ability to effectuate the attempt if not prevented." *Parrish v. Donahue*, 443 N.E.2d 786, 788 (Ill. 1982); *see also Perez v. Globe Ground North America, LLC*, 482 F.Supp.2d 1023, 1031 (N.D. Ill. 2007). A claim for assault must include an allegation of a reasonable apprehension of an imminent battery. *Perez*, 482 F.Supp.2d at 1031. A civil battery in Illinois is defined as "the unauthorized touching of another's person." *See Boyd v. City of Chicago*, 880 N.E.2d 1033, 1043-44 (Ill. App. 2007). To establish a claim for IIED, a plaintiff must demonstrate that: (1) the conduct involved is "truly extreme and outrageous;" (2) the actor intended that his conduct inflict severe emotional distress, or at least knew that there was a high probability that his conduct would cause severe emotional distress; and (3) the conduct, in fact, caused severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). ASC argues that Plaintiffs cannot establish valid tort claims against ASC because they cannot demonstrate that ASC intentionally or directly committed battery, assault, or IIED. However, ASC's argument fails because, even though ASC may not have directly injured either Plaintiff, ASC may be held liable for the torts allegedly committed by Vijay to the extent that the company "expressly authorized" his conduct. Because there is a genuine dispute as to whether ASC "expressly authorized" Vijay's alleged conduct, the Court must reserve consideration of ASC's liability for Vijay's alleged torts for the trier of fact.

### c. IHRA preemption

ASC argues that Plaintiffs' common law tort claims of assault, battery, and IIED are preempted by the Illinois Human Rights Act ("IHRA"). *See* 775 ILCS 5/8-111(c). The Illinois Supreme Court has held that the IHRA preempts tort claims if they are "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 23 (Ill. 1997). In *Maksimovic*, the Illinois Supreme Court concluded that, as a general matter, assault and battery "are long-recognized tort actions which exist wholly separate and apart from a cause of action for sexual harassment under the [IHRA]." *Id.* Extending the Illinois Supreme Court's logic, this Court held in *Temores v. S.G. Cowen* that IIED claims have also "been recognized by the Illinois supreme courts as independent actions since long before the adoption of the IHRA." 289 F.Supp.2d 996, 1007 (N.D. Ill. 2003). Accepting this premise, the crucial inquiry in each particular case is whether the common law claim stems from legal obligations that exist as a matter of Illinois law only under the IHRA and have no other independent foundation. *See id.* at 23; *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006); *Temores*, 289 F.Supp.2d at 1006. If the "plaintiff has established a basis for imposing liability on the defendant independent of any statutory cause of action under the Act," the claims are not preempted by the IHRA. *Maksimovic*, 687 N.E.2d at 22.

Here, as in *Temores*, Plaintiffs allege claims of assault, battery, and IIED that would be actionable whether or not they constitute civil rights violations because the IHRA did not "furnish[] the legal duty that the defendant was alleged to have breached." *Krocka v. City of Chicago*, 203 F.3d 507, 516-17 (7th Cir. 2000) (citing *Maksimovic*, 687 N.E.2d at 23) (internal quotation marks omitted). For example, independent of the duty the IHRA imposes on

employers to refrain from sexually harassing employees, a person has a duty to refrain from touching others without their consent, and breaching that duty constitutes an actionable battery. *Boyd*, 880 N.E.2d at 1043-1044; *Huffman v. MQ Construction Co.*, No. 08 C 3679, 2008 WL 4613903, at *3 (N.D. Ill. Oct. 15, 2008). Plaintiffs have presented evidence from which a reasonable trier of fact could find Vijay liable for assault, battery, and IIIED, regardless of the duties imposed by the IHRA. Accordingly, Plaintiffs' state law tort claims are not preempted by the IHRA.

## *MOTION TO SEVER ANALYSIS*

ASC also moves to sever, or alternatively, to bifurcate Plaintiffs' trials under Federal Rules of Civil Procedure 21 and 42. In support of its motion, ASC argues that Plaintiffs' claims involve separate and distinct alleged acts that do not arise from the same transaction or occurrence and raise different questions of law and fact. Plaintiffs argue, in opposition, that they assert rights to relief based on a series of logically related events, and this logical relationship entitles Plaintiffs to jointly sue ASC.

Pursuant to Fed. R. Civ. P. 20(a), parties may be joined as plaintiffs if: "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to plaintiffs will arise in the action." For joinder to be proper, both requirements of Rule 20(a) must be satisfied. *Nelson v. Chertoff*, No. 07 C 2991, 2008 U.S. Dist. LEXIS 82981, at *13 (N.D. Ill. Sept. 10, 2008); *Bailey v. N. Trust Co.*, 196 F.R.D. 513, 515 (N.D. Ill. 2000). If parties are misjoined, Fed. R. Civ. P. 21 authorizes a court to "sever any claim against a party" and to, "on just terms, add or drop a party."

Federal policy favors joinder, as the purpose of Rule 20 is "to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits." *Nelson*, 2008 U.S. Dist. LEXIS 82981, at *13-*14 (quoting *Bailey*, 196 F.R.D. at 515) (internal quotation marks omitted). "Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966). The district court has "broad discretion whether to sever a claim under Rule 21." *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000).

When evaluating whether a particular situation constitutes a single transaction or occurrence, courts conduct a case-by-case analysis. *See Nelson*, 2008 U.S. Dist. LEXIS 82891, at *15. Some of the factors considered as part of this analysis include:

> the time period during which the alleged acts occurred, whether the acts of discrimination are related, whether there were differing types of adverse employment actions, whether more than one type of discrimination is alleged, whether the same supervisors were involved, whether employees worked in the same department, whether employees were at different geographical locations, and whether a company-wide policy is alleged.

*Berry v. Illinois Dep't of Human Servs.*, No. 00 C 5538, 2001 U.S. Dist. LEXIS 1041, at *60 (N.D. Ill. Feb. 2, 2001). Courts have generally deemed "all logically related events" to comprise a single transaction or occurrence under Fed. R. Civ. P. 20(a). *Bloomquist v. ZLB Behring, LLC*, No. 06 C 6738, 2007 U.S. Dist. LEXIS 73137, at *4 (N.D. Ill. Sept. 28, 2007).

The factors listed above weigh against severance in this case. Where plaintiffs' claims derive from the same type of alleged action by the same employee in the same facility, courts have found severance inappropriate. *See Nelson*, 2008 U.S. Dist. LEXIS 82981; *Smith v. Northeastern Illinois Univ.*, No. 98 C 3555, 2002 U.S. Dist. LEXIS 3883 (N.D. Ill. Feb. 28, 2002). Here, Plaintiffs Benitez and Reyes allege that they experienced the same type of sexual

advances by the same employee, Vijay Patel, during their employment at ASC. Although, as ASC points out, only Plaintiff Benitez alleges that Vijay forced him to engage in oral sex, this distinction is outweighed by the similarities between Plaintiffs' claims; both Plaintiffs claim that Vijay repeatedly groped and fondled them, grabbed their genital parts, and propositioned them for sex. Moreover, Plaintiffs' claims need not be identical in nature to satisfy the "same transaction or occurrence" requirement of Rule 20(a). *See id.* at *6 ("the acts of discrimination, while different, have enough similarities that this factor also weighs against severance"). Both Plaintiffs also claim that ASC retaliated against them by terminating their employment shortly after they complained about Vijay's alleged conduct. Benitez was terminated the day after he allegedly complained to his supervisor, and Reyes has presented evidence that he was terminated days after filing a complaint with the police department.

ASC identifies distinctions between Plaintiffs' claims that pale in comparison to the prevailing similarities discussed above. ASC points out, for example, that Plaintiffs worked in different departments at ASC; Benitez worked in the screening department, while Reyes worked in the plating department. However, this distinction does not defeat the logical relationship between Plaintiffs' claims, as Vijay worked in a department separate from both Plaintiffs (the maintenance department) but allegedly engaged in sexual misconduct while wandering between departments. ASC also argues that Plaintiffs' claims derive from events that occurred at different times. However, even though Reyes alleges that Vijay's unwanted advances began in 1998, he alleges that these advances continued throughout the entire timeframe covered by Benitez's claims, which allegedly date from September or October of 2005 to his termination in January of 2006. Despite the minor differences highlighted by ASC, the Court finds that

Plaintiffs' claims arise from the "same transaction, occurrence, or series of transactions or occurrences" pursuant to Fed. R. Civ. P. 20(a).

Additionally, Plaintiffs meet the second requirement of Fed. R. Civ. P. 20(a) by raising common questions of law and fact. Some of these key questions include:

- Whose knowledge is sufficient to impute knowledge to ASC for the purposes of holding ASC liable for intentional torts or a hostile work environment under Title VII?
- Who had knowledge of Vijay's alleged conduct?
- What responsibilities and powers were held by Amarat Patel and Bharat Patel?
- What were Vijay's responsibilities and powers?
- Did Vijay make unwanted advances toward others employees? If so, was Vijay's behavior so pervasive that ASC had constructive notice of this behavior?
- What were ASC's duties with regard to preventing and addressing sexual harassment?
- Did ASC adequately perform these duties?

Certainly, other common questions of law and fact exist in this case, as both Plaintiffs attempt to hold ASC liable for Vijay's alleged conduct by asserting the same theories of liability for the intentional torts of battery, assault, and IIED, and for a hostile work environment in violation of Title VII. Because Plaintiffs satisfy both requirements for joinder under Fed. R. Civ. P. 20, ASC's motion to sever must be denied.

In the alternative, ASC moves for separate trials under Fed. R. Civ. P. 42(b). Rule 42(b) authorizes the court to order separate trials "[f]or convenience, to avoid prejudice, or to expedite and economize." The court is afforded "broad discretion to decide whether or not plaintiffs' cases should be tried separately," *Bailey*, 196 F.R.D. at 518, and need find only one of the Rule 42(b) conditions satisfied to order separate trials. *MCI Commc'ns Corp. v. Tel. and Tel. Co.*, 708 F.2d 1081, 1066 (7th Cir. 1983). To determine whether separate trials are appropriate, "[t]he trial court must balance the probable savings of time and effort against the likelihood that a party might be prejudiced, inconvenienced, or put to extra expense." *Smith*, 2002 U.S. Dist. LEXIS

3883, at *14 (citing *Bailey*, 196 F.R.D. at 518) (internal quotation marks omitted). However, *some* prejudice is allowed if "the prejudice is not so substantial that it outweighs the savings of time and effort in having a single trial." *Smith*, 2002 U.S. Dist. LEXIS 3883, at *17. In particular, "[w]here a hostile work environment claim is raised and the plaintiffs' claims are factually related enough so as to limit jury confusion, a joint trial may be proper in that concerns of economy and convenience will outweigh concerns of prejudice to the defendant." *Nelson*, 2008 U.S. Dist. LEXIS 82981, at *18; *see also Smith*, 2002 U.S. Dist. LEXIS 3883, at *15 ("the plaintiffs in this case have alleged a hostile work environment, proof of which will likely include evidence involving multiple plaintiffs").

ASC argues that a joint trial would embarrass or delay the trial of the actions and would cause it substantial prejudice. The Court disagrees and finds that considerations of judicial efficiency outweigh any potential prejudice in this case. Because of the common questions of law and fact underlying Plaintiffs' claims, bifurcation would result in a significant overlap of testimony and evidence in each trial. For example, both Plaintiffs' claims require testimony regarding which employees were aware of Vijay's alleged conduct and whether this alleged conduct was pervasive, ASC's management structure, including the roles and responsibilities of department heads Amarat and Bharat, and the adequacy of ASC's sexual harassment policy and response to claims of harassment. Moreover, the striking similarity between ASC's own motions for summary judgment portends the repetitiveness that would result from two trials; ASC asserts nearly identical arguments for summary judgment, and portions of ASC's supporting memoranda are, in fact, completely identical. Requiring two separate triers of fact to consider largely same evidence would unnecessarily squander valuable judicial resources, and ASC has failed to demonstrate prejudice sufficient to justify the time and expense of two duplicative trials. *See*

*Smith*, 2002 U.S. Dist. LEXIS 3883, at *17.  Accordingly, ASC's motion for bifurcation is denied.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment on all of Plaintiff Benitez's claims, Defendant's motion for summary judgment on all of Plaintiff Reyes's claims, and Defendant's motion to sever, or alternatively, to bifurcate Plaintiffs' trials are all DENIED.


Enter:
/s/ David H. Coar
_____
David H. Coar
United States District Judge

**Dated:** January 5, 2010